## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**LARRY WHETSTONE**

            **Plaintiff,**

    **v.**

**UNITED OF OMAHA LIFE INSURANCE COMPANY,**

       **Defendant.**

**Case No. 2:20-cv-3756**

**JUDGE EDMUND A. SARGUS, JR.**

**Chief Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

This matter arises on the parties' cross-motions for judgment on the administrative record. (ECF Nos. 13, 14.) The parties' dispute, in short, centers on whether Defendant United of Omaha Life Insurance Company ("United") arbitrarily and capriciously denied Plaintiff Larry Whetstone ("Whetstone") long-term disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C § 1001, *et seq.* The Court finds that it did. Accordingly, for the reasons stated herein, the Court **GRANTS** Whetstone's Motion for Judgment on the Administrative Record (ECF No. 14) and **DENIES** United's Motion for Judgment on the Administrative Record (ECF No. 13).

## I.  BACKGROUND

From 2012 to 2018, Whetstone, a fifty-eight-year-old Pennsylvania native, worked as a truck driver for Fraley & Schilling, Inc. ("F&S"), a transportation company. (R. at 234.) Generally, this position required him to drive large, eighteen-wheel tractor trailers containing heavy materials around the country. (R at 230, 339.) In so doing, Whetstone was to follow "all federal regulations and company safety standards" related to his job. (R. at 230.)

As an F&S employee, Whetstone participated in an ERISA-qualified benefit plan (the "Plan") administered by United. The Plan contained two separate disability benefit policies: a short-term disability benefit policy, Policy No. GLLP-B9GX (the "STD Policy"), and a long-term disability benefit policy, Policy No. GUPR-B9GX (the "LTD Policy"). (R. at 15, 260.) These policies largely mirrored one another. Both, for starters, obligated United to pay benefits to claimants that it found to be "Disabled."[1] (R. at 1, 27, 246, 275.) They also defined the term "Disability" similarly. Under the LTD Policy, a claimant qualified as "Disabled" if (1) "an Injury or Sickness" changed his or her "mental or physical functional capacity" so significantly that it (2) "prevented [him or her] from performing at least one of the Material Duties of [his or her] Regular Occupation (on a part-time or full-time basis)" beyond a specific "Elimination Period," and, accordingly, (3) rendered the claimant "unable to generate Current Earnings which exceed[ed] 99% of [his or her] Basic Weekly Earnings." (R. at 280.) The STD Policy effectively contained the same disability definition, save for the fact that it required claimants to be unable to perform at least one of the "Material Duties" of their "Regular Job"—not their "Regular Occupation."[2] (R. at 32.)

Whetstone's short- and long-term disability policies shared other commonalities. Both recognized mental impairments as a potential cause of disability, although the LTD Policy—unlike the STD Policy—only recognized conditions or disorders "listed in the most recent edition of the

---

[1] STD benefits were available for a maximum of twenty-six weeks, while LTD benefits were to be paid monthly for two years, after which United would reevaluate the claimant's eligibility under a "total disability" standard. (R. at 280.) As discussed below, this reevaluation did not apply to claimants with a "Mental Disorder," whose benefits were capped at twenty-four months unless their condition "confined [them] as a resident inpatient in a Hospital," in which case United would continue to pay benefits. (*Id.*)

[2] Under the LTD Policy, a claimant's "Regular Occupation" was defined as the occupation they "routinely performed" when his or her disability began "based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary or Occupational Titles (DOT)" or by "another service or other information" that United believed was "of [a] comparable purpose." (R. at 283.) By contrast, under the STD Policy, a claimant's "Regular Job" constituted the occupation he or she "routinely performed" when his or her disability arose. (R. at 34.)

International Classification of Diseases (ICD) and the Diagnostic and Statistical Manual of Mental Disorders (DSM)." (R. at 282.) Both policies also afforded United the discretion to (1) "construe and interpret" their provisions and (2) "decide all questions of eligibility and all questions regarding the amount" of benefits to be paid. (R. at 28, 276.) Neither, however, obligated claimants to provide a specific type of proof of impairment. (R. at 27-28, 275-76.) Instead, United reserved the right to "require" claimants to provide "supporting information which may include, but [was] not limited to . . . a) clinical records; b) charts; c) x-rays; d) Proof of Earnings; and e) other diagnostic aids." (R. at 28, 276.) It also held the power to have claimants under either policy examined by a physician or "vocational rehabilitation expert" of its choosing. (R. at 27, 275.) However United chose to proceed on a given claim, it reserved the ability to "rely on the accuracy and completeness of any information furnished by the Policyholder, [the claimant], or any other third party" to render its benefits decisions. (R. at 28, 276.)

### A. The Motor Vehicle Accident

On April 27, 2018, a bus careened into Whetstone's truck as he exited a turnpike in Allegheny County, Pennsylvania (the "Motor Vehicle Accident" or "MVA"). (R. at 490, 545.) Whetstone suffered no external injuries but was "shaken up" to the point of experiencing an increased heart rate, chest pains, shock, and numbness. (R. at 545, 557, 797.) Given his symptoms and pre-existing bout with hypertension, Whetstone sought to have his blood pressure checked. (R. at 557, 797.) Thus, he drove to the Trinity Health System Express Care Center (the "Trinity Care Center") in Steubenville, Ohio. (R. at 545.) There, testing revealed a normal pulse, as well as a blood pressure reading of 132/72. (R. at 548.) Whetstone's treating physician described his condition overall as "good," but cautioned that he may feel "achy, stiff and tight" in the days to

follow.  (R. at 546, 549.)  Accordingly, he recommended Whetstone to consult his primary care physician if any particular symptom worsened.  (*Id.*)

### B.  Whetstone's Anxiety Symptoms Arise

#### 1.  Dr. Hess

Two days after the MVA, Whetstone suffered an accident-related nightmare that awoke him in the night.  (R. at 797.)  He suffered another nightmare the next day during a nap.  (*Id.*)  The recurrence of these events drove Whetstone to meet with his primary care physician, Dr. Kenton Hess, MD, on May 1, 2018.  (*Id.*)  Amidst this consultation, Whetstone relayed the events of the MVA and the physiological symptoms he felt in its wake—which, outside of insomnia, included a loss of appetite and difficulty concentrating.  (*Id.*)  Dr. Hess administered a depression screening (a "PHQ-2"), which asked Whetstone whether he felt "[l]ittle interest or pleasure in doing things" or "down, depressed, or hopeless" within the previous two weeks.  Whetstone answered both questions in the affirmative.  (*Id.*)  Whetstone's vitals revealed a Body Mass Index of 28.38 and blood pressure reading of 137/93, tracking with his history of hypertension and hyperlipidemia.  (R. at 797-98.)   A general examination revealed no immediate physical or psychological abnormalities (*i.e.*, delusions or non-linear thought processing).  (*Id.*)

Ultimately, Dr. Hess deemed Whetstone's symptoms to stem from an "[a]cute stress disorder – F43.0," which he noted were common for those who experience traumatic events.  (R. at 798.)  He advised that this diagnosis would shift to posttraumatic stress disorder ("PTSD") if Whetstone's symptoms persisted beyond four weeks, at which point he counseled Whetstone to consider medication.  (*Id.*)  In the short term, Dr. Hess referred Whetstone for cognitive behavioral therapy, and scheduled a follow-up appointment with him in four weeks. (*Id.*)

### 2.  Whetstone's Workers Compensation Claim

After consulting Dr. Hess, Whetstone did not return to work.  (R. at 235.)  Shortly thereafter, he applied to the Pennsylvania Bureau of Workers' Compensation (the "Bureau") for workers' compensation.  (R. at 218.)  On May 15, 2018, the Bureau denied his claim.  (R. at 217-18.)  It offered no explanation for its decision other than its position that Whetstone had not suffered a "work-related injury."  (*Id.*)  Whetstone appealed, and, ultimately, reported obtaining a settlement.  (R. at 43.)

### 3.  Therapist Feragotti

On May 14, 2018, Whetstone conducted an initial consultation with therapist Robert Feragotti, MS, LPC, NCC ("Therapist Feragotti" or "Feragotti").  (R. at 210.)  In documenting Whetstone's rationale for seeking treatment, Feragotti noted the following:

> Client was involved in a motor vehicle accident while at work and involving his tractor trailer truck. Since the accident, the client has experienced insomnia, increased anxiety, irritability, decreased mood, and fear of driving his tractor trailer truck. Client would like to resolve his symptoms and return to employment.

(R. at 553.)  Within this consultation, Therapist Feragotti administered a "Mental Status Exam," which found Whetstone to exhibit signs of depression and anxiety.  (R. at 555.)  These observations, in tandem with Whetstone's other ailments (*e.g.*, hypertension), led Feragotti to assess Whetstone with a Global Assessment of Functioning ("GAF") score of fifty-five, which indicated "moderate signs of impairment."  (R. at 524, 553.)  Ultimately, Feragotti—like Dr. Hess—concluded that Whetstone suffered from an "acute stress" disorder that rendered him "unable to drive a tractor trailer truck."  (R. at 553.)  To alleviate this condition, the two agreed to formulate a treatment plan that would allow Whetstone to return to work and manage his financial stress.  (R. at 556.)  They resolved to meet weekly until those goals were met.

### 4. Whetstone's Second Consultation with Dr. Hess

On May 17, 2018, Whetstone followed up with Dr. Hess, who administered another PHQ-2—which, this time, was negative for depression.  (R. at 441.)  Whetstone remarked that his initial therapy session was "helpful," and reported a slight improvement in his sleep quality.  (R. at 441.)  He added, however, that he continued to struggle with nightmares and bouts of insomnia.  (*Id.*)  Simultaneously, Whetstone reported feeling "hyperaware" and "more irritable" while driving, so much so that it detracted from his ability to concentrate on the road.  (*Id.*)

Notwithstanding these struggles, Whetstone reaffirmed his intention to return to work. (*Id.*)  In the meantime, however, he sought to apply to United for STD benefits. To support his application, Dr. Hess completed an "Attending Physician Statement" ("APS") which declared that Whetstone (1) suffered from an acute stress disorder that rendered him "unable to drive/operate vehicle/machinery" for work; (2) had begun cognitive behavioral therapy; and (3) had been separately referred to a psychiatrist.  (R. at 329-30.)  It also estimated that Whetstone would be able to return to work full-time within one-to-three months.  (*Id.*)

### C.  Whetstone Applies for STD Benefits

On May 18, 2018, Whetstone applied for STD benefits.  (R. at 235.)  Throughout the ensuing month, Whetstone met with Therapist Feragotti four times.  (R. at 557-60.)  Within these sessions, Whetstone reported experiencing insomnia, fatigue, headaches, lessened appetite, elevated blood pressure, confusion, and poor concentration.  (R. at 557.)  He also described suffering a mounting aversion to driving, particularly in heavier cars that reminded him of a truck. (R. at 558.)  This avoidance, Whetstone noted, was the result of various "unanticipated and highly uncomfortable physiological response[s]" suffered behind the wheel.  (*Id.*)  At one point, for instance, Whetstone described how the mere act of driving his mother's Jeep threw his breathing off and caused his heart rate to spike.  (*Id.*)  In another session, he described having to pull over to

6

engage in various therapeutic exercises after another driver cut him off on a one-and-a-half-mile route home. (R. at 560.)

On May 29, 2018, Therapist Feragotti changed Whetstone's diagnosis from an "acute stress response" to PTSD, citing the fact that Whetstone's symptoms had not resolved within the last thirty days. (R. at 558.)

### 1. Dr. Tripp

On June 12, 2018, Whetstone met with Dr. Adam Tripp, a psychiatrist, for the first time. (R. at 772.) Whetstone conveyed feeling "up and down" over the past month, and reported suffering from nightmares, flashbacks, feelings of avoidance, and occasional bouts of "derealization." (*Id*.) Dr. Tripp performed a "Mental Status Exam," which, on the whole, yielded normal results, but noted some deficiencies in Whetstone's concentration and recall abilities. (R. at 773.)

Ultimately, Dr. Tripp assigned Whetstone a GAF score of forty-five, and diagnosed him with three different conditions: a recurrent major depressive disorder ("MDD"), a generalized anxiety disorder ("GAD"), and an acute stress disorder. (R. at 773-74.) Dr. Tripp opined that the latter diagnosis was "directly caused" by the MVA. (R. at 773.) To treat Whetstone's symptoms, Dr. Tripp prescribed fifty milligrams of Trazodone and twenty-five milligrams of Zoloft. (R. at 774.)

### D. United Approves Whetstone's STD Benefits

On June 19, 2018, Whetstone, at Therapist Feragotti's direction, completed a "PCL-5" checklist to gauge the presence and severity of his anxiety symptoms. (R. at 561.) He scored a 48/80, which suggested that he could benefit from PTSD treatment. (*Id.*)

That same day, United approved Whetstone's STD benefit application. (R. at 181.) In rendering its approval, United estimated that Whetstone's anxiety condition would subside by June 13, 2018. (*Id.*) Thus, it retroactively awarded Whetstone STD benefits from May 10, 2018 (the end of Whetstone's "Elimination Period") until then. (*Id.*) In the event Whetstone believed his disability extended beyond June 13, United advised that he could apply for an extension, and that, to do so, he would need to have his providers submit updated medical records for its review. (*Id.*)

### E. United Extends Whetstone's STD Benefits Several Times

Between June 19, 2018 to October 19, 2018, United extended Whetstone's STD benefits at least four times. (R. at 66, 108, 141, 163.) Throughout that period, Whetstone saw Therapist Feragotti weekly, Dr. Tripp monthly, and Dr. Hess intermittently. The records of all three reflect that, at the outset of this period, Whetstone's anxiety symptoms slightly improved, then regressed. (R. at 333-390, 561-66.)

By the end of July 2018, Whetstone reported experiencing nightmares "on a nightly basis," and continued to suffer acute, driving-induced panic attacks that would "often [require him to] pull off the road and engage in breathing exercises"—exercises which, according to Whetstone, were becoming of little immediate help. (R. at 562-63.) These acute reactions were severe enough to cause Whetstone to look into arranging for third-party transportation to-and-from his medical appointments. (R. at 563, 566.) In this same period, Whetstone completed the first of two "Becks Depression Inventory" ("BDI-II") assessments, scoring a 27/63, which suggested that he suffered from "high moderate depression."[3] (R. at 564.) The next month, Dr. Tripp increased Whetstone's Zoloft dosage to 100 milligrams. (R. at 768.)

---

[3] Two months later, on September 11, 2018, Whetstone completed another BDI-II, this time scoring a 37/63, putting his depression in the "[l]ow severe range." (R. at 568.) He also completed another PCL-5 self-assessment, scoring a 62/80—a nine-point increase from his previous assessment. (*Id.*) Generally, "a total score of 31-33 or higher" on a

Whetstone's symptomology reached a high point on September 19, 2018. That night, he awoke around midnight with a distinct pain in the left side of his chest and shortness of breath. (R. at 883.)  He immediately checked himself in to the emergency room at the Allegheny Health Network ("AHN") Jefferson Regional Hospital.  (*Id.*)  Upon intake, Whetstone remarked that, although he had experienced similar pains "intermittently since April when he was in a car accident," this time felt different.  (*Id.*)  Two electrocardiograms ("EKG") revealed an "abnormal" heart rate.  (R. at 886, 894.)  A "stress test," however, led Whetstone's physicians to conclude that the episode was "likely anxiety induced."  (R. at 894.)  Nevertheless, Whetstone's physicians could not rule out other causes, such as an "[a]nterior infarct."[4]  (R. at 912.)

By the end of October 2018, Therapist Feragotti submitted three APS' in support of Whetstone's continuing STD benefits claims, while Dr. Tripp submitted two. (R. at 333, 335, 339, 341, 373.)  All of Feragotti's statements noted that Whetstone's symptoms were both "consistent" with PTSD and "limiting his ability to engage in all aspects of his life," including his ability to drive a truck.  (R. at 335, 341, 373.)  Two asserted that, due to the MVA, Whetstone continued to endure a "fear response when in a position where he needs to drive to his therapy appointments," causing him to suffer an "increased heart rate, increased startle response, anxiety and panic, and a fear of losing control and being involved in an automobile accident."  (R. at 341, 373.)  None offered an estimate as to when Whetstone would be able to return to work.  (*Id.*)

Dr. Tripp's APS' largely reflected Therapist Feragotti's.  In a statement dated August 17, 2018, Dr. Tripp affirmed that Whetstone was "not able to do anything related to driving an 18 wheeler tractor trailer or other commercial truck," and observed that Whetstone was "becoming

---

PCL-5 exam demonstrates that "a patient may benefit from PTSD treatment."
https://www.ptsd.va.gov/professional/assessment/documents/using-PCL5.pdf
[4] "Infarct" most likely refers to an infarction, as in an obstruction of the blood supply. A myocardial infarction is commonly referred to as a heart attack. https://www.cdc.gov/heartdisease/heart_attack.htm.

increasingly phobic of driving 'regular' cars and trucks."  (R. at 339.)  Unlike Therapist Feragotti, Dr. Tripp estimated that Whetstone would be able to return to work by January 1, 2019.  (*Id.*)  That estimation changed in Dr. Tripp's second APS, dated October 18, 2018, which shifted Whetstone's diagnosis from an "acute stress" condition to PTSD, and affirmed that Whetstone could not "drive or work in any capacity related to driving" for "at least 6 months."  (R. at 333.)  It also noted several changes to Whetstone's prescriptions—namely, that his Zoloft dosage had increased to 150 milligrams, and that Clonazepam had been substituted for Trazodone as a sleep aid.  (*Id.*)

On October 19, 2018, United extended Whetstone's STD benefits until November 7, 2018—the last date allowable under the STD Policy.  (R. at 66.)  This extension was underpinned by the approval of one of United's in-house clinical nurses, who noted the following:

> The medical records by Robert Feragotti, LPC, indicate that the claimant continues with episodic mood lability, significant anxiety, psychomotor agitation, anhedonia, and isolation to his home. He is addressing transportation assistance to his psychiatric appointments that echoes no significant improvement. His symptoms were triggered by multiple stressors of financial, employment and workers compensation legal representation. While there were no updated psychiatrist records; the claimant was compliant with medications and appropriate therapy. The records convey that the claimant was recently hospitalized.
>
> Based on length of time out of work with no consistent improvement, ongoing overall symptomology and intensity of treatment, the limitations in mood modulation, ability to concentrate, attain set limits and interact and express feelings appropriately are correlated with the documentation.
>
> Based on the current clinical documentation reviewed there is sufficient clinical evidence of identifiable mental restrictions and limitations from 9/24/18 and going forward through STD time frame.

(R. at 303.)

### F.  Whetstone's Applies for LTD Benefits

After his final STD benefits extension, Whetstone applied for LTD benefits.  (R. at 52.) On October 25, 2018, United sent Whetstone a letter acknowledging his LTD application, as well

as the fact it had already requested his medical providers for their updated records.  (R. at 996.)
On November 29, 2018, United received those records and forwarded Whetstone's file to
psychologist Dr. David Yuppa, MD, for review.  (R. at 47.)

###### 1.  The Yuppa Report

United tasked Dr. Yuppa with answering a single question: whether the record "support[ed]
psychiatric impairment from 5/3/18 forward."  (R. at 47, 822.)  On December 17, 2018, Dr. Yuppa
answered "no" in the form of a seven-page report (the "Yuppa Report").  Therein, Dr. Yuppa
concluded that, even though "[t]he totality of the documentation support[ed]" Whetstone's claims
of suffering "emotional distress" after the MVA, there was no "compelling" evidence "to support
the presence of functional impairment."  (R at 825-26.)  Dr. Yuppa determined that Whetstone's
stated inability to drive a "motor vehicle" was a product of his own "self-imposed avoidance,"
rather than a true psychiatric disorder, pointing to the fact that, notwithstanding his reported
anxiety, Whetstone was "capable of driving to and from his [medical] appointments despite his
associated anxiety."  (R. at 826-27.)  Dr. Yuppa noted that he had been able to speak with Dr.
Tripp (but not Dr. Hess or Therapist Feragotti), and that, based on their conversation, as well as
the record as a whole, there was no evidence of any "cognitive testing / assessments to support
impairment" in the domains of "attention, concentration, etc."  (R. at 825-26.)  He further found
that Whetstone's anxiety was "mostly related to . . . other administrative, benefits-related matters,"
and added that, if Whetstone was actually functionally impaired, he would have exhibited different
symptoms, such as "deficiencies in grooming/hygiene . . . suicidal ideation, poor impulse control,
homicidal ideation, paranoia, psychosis, delusional thinking, disorganized thought processing,
aggressive/hostile ideation/behavior, or conversely, catatonic-like or excessively withdrawn
behavior."  (R. at 825.)

Simultaneously, Dr. Yuppa acknowledged that there was "no evidence" that Whetstone had magnified or exaggerated his symptoms. (R. at 827.) Thus, he concluded that Whetstone's regimen of "medications and psychotherapy" constituted "an appropriate treatment plan," and determined that, notwithstanding its apparent deficiencies, the record "support[ed] a diagnosis of adjustment disorder with mixed anxiety and depressed mood." (R. at 826-27.)

### 2.  United Denies Whetstone's LTD Claim

On December 28, 2018, United denied Whetstone's claim for LTD benefits via a seven-page letter (the "Denial Letter"). (R. at 532-39.) The first half of this letter summarized the LTD Policy and the records of Whetstone's treating practitioners. (R. at 532-35.) It then provided a five-paragraph synopsis of Dr. Yuppa's findings, reiterating multiple times his opinion that there was no "compelling" evidence of functional impairment. (R. at 535-36.) Based on these findings, United concluded that Whetstone had "failed to show" that he was psychiatrically impaired from "perform[ing] at least one of the Material Duties of [his] Regular Occupation" moving forward. (R. at 536.) It did not define Whetstone's "Regular Occupation" or his "Material Duties." (*Id.*)

### 3.  Whetstone Appeals United's Decision

On March 11, 2019, Whetstone internally appealed United's denial of benefits. (R. at 530.) In his formal appeal (the "Appeal Letter"), Whetstone reiterated his stance that he was "unable to perform the duties of his position," pointing specifically to the Department of Labor's ("DOL") regulation governing the "physical qualifications" of commercial drivers, 49 C.F.R. 391.41. (*Id.*) He noted that part of this regulation—49 C.F.R. 391.41(b)(9)—disqualified drivers who possessed any "mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with [their] ability to drive a commercial motor vehicle safely." (R. at 530, 581.) In addition to a full

copy of 49 C.F.R. 391.41, Whetstone provided United with medical records from his visit to the

Trinity Health System Express Care Center on the day of the MVA.  (R. at 530.)

On March 19, 2019, United confirmed its receipt of Whetstone's appeal.  (R. at 525.)  It

assured Whetstone that his claim was "currently under review," and that "all documentation"

would be considered before it rendered its final decision.  (*Id.*)  That same day, United forwarded

Whetstone's updated file to another psychiatrist, Dr. Jennifer Service, MD, for a second review.

(R. at 42.)

### 4. The Service Report

On April 1, 2019, Dr. Service submitted a written report to United (the "Service Report")

which, like the Yuppa Report, concluded that there was "no compelling evidence" that Whetstone

had "experienced an impact on his functional capacity as a result of psychological symptoms."  (R.

at 316-22.)  After summarizing the documents in Whetstone's file—which included Whetstone's

updated medical records and a copy of 49 C.F.R. 391.41—Dr. Service elaborated her conclusion:

> The claimant is a 58-year-old truck driver who reportedly left work due to symptoms of PTSD, major depression, and generalized anxiety disorder resulting from a motor vehicle accident that occurred on 04/27/2018. The claimant reported that he was unable to drive following the 04/27/2018 accident due to anxiety. The claimant's psychiatrist supported his restriction from driving for six months. It was unclear in the record how Dr. Tripp assessed the claimant's ability to drive and it appeared that Dr. Tripp relied solely on the claimant's self reports. The claimant's mental status examinations revealed that the claimant's mood/affect was frustrated and decreased, but the examinations were otherwise unremarkable. There was no compelling evidence to support that the claimant suffered from any cognitive deficits, including any problems interacting with others, communicating, or acting in his own interest. There were no objective measures used to assess the claimant's cognition and there were no subjective descriptions of any observed cognitive problems. There were limited medication changes and the claimant was not referred to a higher level of care. Although the claimant complained of an inability to drive and he was restricted from driving by his psychiatrist, the information available in the record did not support the severity of symptoms or intensity of treatment expected with an impairing psychological disorder.

(R. at 319.)

Like Dr. Yuppa, Dr. Service found no evidence that Whetstone exaggerated or magnified his symptoms.  (R. at 322.)  Unlike Dr. Yuppa, she did not speak with any of Whetstone's treating practitioners in rendering her report.  (R. at 319.)  She explained that Whetstone's self-reports were "considered," but that she "did not find them to be compelling[,] as the information documented in the available records did not support the severity of symptoms or intensity of treatment expected with an impairing psychological disorder."  (R. at 320.)

All told, Dr. Service found that Whetstone's symptoms were "most consistent with an acute stress reaction," not PSTD, MDD, or GAD.  (*Id*.)  She did not discuss whether Whetstone would continue to suffer these acute reactions, or if he was still "physically qualified" to drive a truck under 49 C.F.R. 391.41.  She simply determined that, based on the record, the diagnoses and recommended restrictions of Whetstone's treating practitioners were "not supported."  (R. at 321.)

### 5.  United Upholds Its Decision

On April 2, 2019, United faxed a copy of the Service Report to Richard DeBlasio, Whetstone's then-attorney, and offered Whetstone fourteen days to respond with any additional information for United's review.  (R. at 42*.*)  On April 10, 2019, DeBlasio conveyed to United that he had received the Service Report and that Whetstone would not submit any further information in support of his appeal.  (*Id.*)

On April 18, 2019, United affirmed its decision to deny Whetstone's LTD claim.  (R. at 295.)  The letter notifying Whetstone of this decision (the "Affirmation Letter") specifically noted that, in performing its review, United considered (1) Whetstone's LTD claim forms; (2) an APS and "Disability Supplemental Form" completed by Dr. Tripp on October 18, 2018; (3) A

14

"Disability Supplemental Form" completed by Therapist Feragotti on August 8, 2018; (4) the other notes and records of Whetstone's treating practitioners; and (5) the Service Report. (R. at 296.)

In summarizing the Service Report, United emphasized Dr. Service's conclusions that Whetstone failed to provide "compelling evidence to support the presence of an impairing psychologic condition beyond May 1, 2018[;]" that it was "unclear from the record how Dr. Tripp assessed Mr. Whetstone's ability to drive[;]" and that it appeared his assessment was based "solely on Mr. Whetstone's self-reports." (R. at 299.) Based on these findings, United again concluded that Whetstone had failed to "substantiate any deficits in [his] cognitive functioning, psychomotor behavior, or provide evidence of worsening depression with suicidal or homicidal ideation." (R. at 299.) Nor, in United's view, did Whetstone provide any evidence of (1) hospitalization, (2) "impairment" to his "daily activities," or (3) an inability to drive. (*Id.*) Thus, United remained un-swayed from its initial determination that Whetstone could perform all of "the material duties of his regular occupation beyond May 1, 2018." (*Id.*)

## G.    Procedural History

On July 27, 2020, Whetstone challenged United's decision in this Court. (ECF No. 1.) His action, pursuant to ERISA § 502(a)(1)(B), seeks to overturn United's disability finding and recover benefits that he asserts he is entitled to under the LTD Policy. (*Id.*)

On April 13, 2021, both parties filed cross-motions for judgment as a matter of law based on the administrative record. (ECF Nos. 13, 14.) Several weeks later, on May 7, 2021, they responded to one another's motions. (ECF Nos. 19, 20.)

## II.    STANDARD OF REVIEW

"Under ERISA, courts start with a presumption rooted in the common law of trusts that they will review a plan administrator's denial of benefits de novo." *Autran v. Proctor & Gamble*

15

*Health & Long-Term Disability Benefit Plan*, No. 20-6432, slip op. at 3 (6th Cir. Feb. 24, 2022) (citing *Firestone Tire & Rubber Co. v. Bruch*, 589 U.S. 112-15 (1989)). Often, however, ERISA-qualified plans will "delegate discretionary power to administrators to interpret plan terms and apply those terms to a participant's circumstances." *Id.* (citation omitted). In that event, "courts will review an administrator's benefits denial under an arbitrary-and-capricious standard." *Id.* (citing *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013)). This requires a court to "uphold an administrator's benefits decision as long as 'it is the result of a deliberate, principled reasoning process and . . . supported by substantial evidence.'" *Id.* (citing *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541 (6th Cir. 2020)).

Arbitrary and capricious review is "extremely deferential and has been described as the least demanding form of judicial review." *McDonald v. W.-S. Life Ins. Co*, 347 F.3d 161, 169 (6th Cir. 2003) (citation omitted)). That, however, does not mean it is "without some teeth," or that it requires courts to simply "rubber stamp" an administrator's denial of benefits when that decision is based on *some* reasoning, no matter how weak. *Id.* at 172. To pass muster, an examining court must confirm that the administrator's decision was both "substantively" and "procedurally" rational. *Autran*, slip op. at 3. This entails two analytically distinct inquiries. *Id.* On the substantive side, courts must ensure that the conclusions underlying a plan administrator's benefits denial "are supported by substantial evidence in the administrative record." *Id.* (citations omitted). The procedural prong, by contrast, requires a determination that said denial resulted from a "rational" review process. *Id.* This inquiry usually begs a "variety of questions," including, but not limited to:

> Did the administrator consider all the evidence or overlook evidence that cut the other way? If the administrator departed from its earlier benefits ruling, did it adequately explain the change? . . . If the administrator credited certain doctors over others, did the credited doctors undertake a mere "file" review or conduct a

> thorough in-person evaluation? And did the administrator have a conflict of interest
> that affected its decision?

*Id.* (citations omitted). No single answer to any of these questions is "dispositive" on its own; each must be weighed amongst one another to decipher the sufficiency of the administrator's decision-making process. *Id.* (citing *Metro Life Ins. Co v. Glenn*, 554 U.S. 105, 117-18 (2008)). At all stages of this analysis, the court is "confined" to the administrative record. *Haning v. Hartford Life & Accident Ins. Co.*, 140 F. Supp. 3d 654, 663 (S.D. Ohio 2015) (quoting *Fahrner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011)).

Here, there is no dispute that the LTD Policy vested United with the discretion to interpret its provisions. Thus, the Court will review United's decision to deny Whetstone LTD benefits under the arbitrary-and-capricious standard.

### III.    ANALYSIS

Whetstone offers a litany of reasons as to why United's denial of benefits was both substantively and procedurally irrational. He asserts, for one, that no valid medical or vocational evidence in the record actually supported United's decision—only the "faulty" opinions of "peer reviewers" who, unlike the providers that vouched for Whetstone's disability, never actually examined him. Whetstone also points out a slew of deficiencies with United's review process—all of which, he asserts, fostered its irrational benefits decision.

Whetstone's position is on-point. Simply put, United's non-disability finding did not have a "substantial" basis in the record, given that the evidence it relied upon hardly spoke to Whetstone's ability to drive commercially (*i.e.*, his "Regular Occupation"). It also overlooked and outright mischaracterized several parts of the record that supported Whetstone's claim.

### A.  United's Conclusion Did Not Rationally Follow from the Evidence It Relied upon

Substantively, the parties' dispute revolves around United's view that Whetstone was "not precluded from performing at least one of the material duties of his regular occupation beyond May 1, 2018."  (R. at 300.)  Whetstone argues that this conclusion (1) did not rationally follow from the opinions of its "peer reviewers" and (2) was otherwise inconsistent with "the quantity and quality of the medical evidence" in his file.  *Haning*, 140 F. Supp. 3d at 674 (quoting *Moon v. Unum Provident Corp.*, 405 F.3d 373, 382 (6th Cir. 2005)). On both counts, the Court agrees.

#### 1.  Whetstone's Evidence of Disability Was Strong

As United notes, "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). But that does not mean, as United appears to contend, that this Court must wholesale adopt its decision not to credit those opinions. *Pitts v. Prudential Ins. Co. of Am.*, 534 F. Supp. 2d. 779, 789 n. 3 (S.D. Ohio 2008) (noting that *Nord*'s rejection of the "Treating Physician Rule" was not "a mandate that special weight may never be given to treating physicians based upon the substantive judgments of a reviewing court"). Indeed, this Court—contrary to an administrator's decision otherwise—has repeatedly granted weight to the opinions of a claimant's treating practitioners partially because they were the "only ones who actually examined" him or her. *Weidauer v. Broadspire Servs., Inc.*, No. C-3-07-797, 2008 WL 4758691, at *11-15, (S.D. Ohio Oct. 27, 2008); *see also Haning*, 140 F. Supp. 3d at 665; *Pitts,* 534 F. Supp. 2d. at 789.

As described above, three different providers—Dr. Hess, Dr. Tripp, and Therapist Feragotti—submitted six APS' to United on Whetstone's behalf, all of which stating "in no uncertain terms" that Whetstone's mental condition precluded him from returning to work as a truck driver. *Haning*, 140 F. Supp. 3d at 664l; (R. at 330, 333, 335, 339, 341, 373.)  Of the two mental-health specialists with whom Whetstone consulted (Therapist Feragotti and Dr. Tripp),

both opined that his disability stemmed from acute stress connected to PTSD. These opinions were based on weekly (in Therapist Feragotti's case) or monthly (in Dr. Tripp's case) consultations with Whetstone, who consistently reported symptoms of driving-induced panic and insomnia. In several of those consultations, Whetstone completed PCL-5 and BDI-II exercises, the results of which all supported his diagnoses of PTSD and depression. These developments were significant enough for Dr. Tripp to (1) prescribe Whetstone Zoloft for his anxiety and Trazodone (and, later, Clonazepam) for his insomnia; and (2) to increase Whetstone's Zoloft dosage by 125 milligrams over a four-month period.

United, pointing to the opinions of its "peer reviewers," insists that the disability findings of Whetstone's treating practitioners warrant little deference because they were not based on "objective" evidence. This argument, as elaborated below, is unpersuasive for several reasons. One of them is the fact that, "[u]nlike cardiologists or orthopedi[sts], who can formulate medical opinions based upon objective findings derived from objective clinical tests," mental-health care providers "typically" *must* rely on subjective reports to treat their patients. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed. Appx. 495, 508 (6th Cir. 2008) (citation omitted); *accord James v. Liberty Life Assur. Co. of Boston*, 582 Fed. Appx. 581, 589 (6th Cir. 2014) ("[P]sychiatrists typically treat symptoms that are subjective and must rely on a patient's subjective descriptions to evaluate and diagnose the patient."); *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) ("[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques."). Thus, unless there is a rational

reason to find those practitioners' observations unreliable—and, here, United offers none—then this Court believes they merit ample weight. *See Haning*, 140 F. Supp. 3d at 665.

As discussed below, one of the biggest flaws in United's benefits determination is the fact that it was "based on evidence that simply is not analyzed in relation to [Whetstone's] ability to perform [his] occupation." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). This oversight was particularly inexcusable given the fact that Whetstone, relying upon 49 C.F.R. 391.41, gave United a clear basis to consider the impact of his illness on his ability to drive commercially. (R. at 530, 581-84.) As noted, that regulation physically disqualified commercial drivers who possessed a "mental, nervous, organic, or functional disease or psychiatric disorder *likely to interfere with [their] ability to drive a commercial motor vehicle safely*." (R. at 581) (emphasis added). A truck driver who, at any moment, may suffer a PTSD-related "fear response" which requires him to immediately pull off the road—which Whetstone reported having to do numerous times—clearly fits that bill.

Thus, the Court finds that Whetstone's evidence, in its totality, "strongly" supports his long-term disability claim. *See Haning*, 140 F. Supp. 3d at 665.

## 2. United's "Peer Review" Evidence Was Weak

From the outset, United has stood by the assertion that "the totality of evidence in the record" demonstrates that Whetstone was not "Disabled" under the LTD Policy. (*See* Def.'s Mot., ECF No. 13 at PageID #1080); (R. at 536.) Here, however, United's actions—its correspondence with Whetstone, its internal notes, and its own arguments—all suggest that it overwhelmingly relied on the opinions of Dr. Yuppa and Dr. Service to render its decision. (*See* ECF Nos. 13 at PageID #1074-78; 19 at #1119-20) (arguing that "United reviewed substantially more evidence when it adjudicated Plaintiff's LTD claim than it had during the STD claim process" because, at

that point, it "had the benefit" of the Yuppa and Service Reports); (R. at 304-305, 330-31, 536.)

Thus, United's ultimate conclusion—that Whetstone's anxiety did not preclude him from

performing at least one of his "Material Duties"—should rationally follow from those opinions.[5]

*See Elliott*, 473 F.3d at 621; *see also Card v. Principal Life Ins. Co.*, 790 Fed. Appx. 730, 744 (6th

Cir. 2019) (Larsen, J., dissenting) (reiterating the administrator's requirement to articulate "a

rational connection between the facts found and the choice made"). It does not, as neither Dr.

Yuppa nor Dr. Service actually assessed Whetstone's "ability to perform [his] job-related tasks."

*Elliott*, 473 F. 3d at 619. Instead, they focused on whether the "medical evidence" demonstrated

that Whetstone was "functionally impaired" from driving entirely, rather than *commercially*.

Take, for instance, United's reliance on Dr. Yuppa's assessment that Whetstone, on a

"functional" level, was "indeed capable of operating a motor vehicle, albeit with associated

anxiety" because he was able to drive to-and-from his medical appointments.  (R. at 825.)  As

Whetstone notes, the fact he was "capable" of gutting through his anxiety on a one-and-a-half-

mile drive to his doctor's office says little about his ability to safely maneuver an eighteen-wheeler

across multiple states.[6]  (*See* R. at 581) (delineating the requisite mental skills for commercial

driving, including "the perceptual skills to monitor a sometimes complex driving situation, the

judgment skills to make quick decisions . . . and the manipulative skills to control an oversize[d]

steering wheel, shift gears using a manual transmission, and maneuver a vehicle in crowded

---

[5] As United notes, the mere fact it relied on these "peer reviews" does not necessarily mean that it lacked "substantial" evidence. *See, e.g.*, *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015) (noting that "there is nothing inherently improper with relying on a file review," but confirming that an administrator's decision to do so can still "raise questions about the thoroughness and accuracy of the benefits determination") (citations omitted). But it *also* does not mean that United's "peer reviews" *were* "substantial" evidence. In other words, it must still be clear that United based its decision on "more than a scintilla" of evidence that a "reasonable mind might accept as adequate to support [its] conclusion." *Davis*, 980 F.3d at 549.

[6] United argues that Dr. Yuppa did not "equate" truck driving to regular driving, but merely used it as a possible indicator "of the level of anxiety [Whetstone] was experiencing." (Def.'s Resp., ECF No. 19 at PageID #1114.)  This distinction makes little difference. Again, just because Whetstone was not utterly paralyzed from entering a car did not mean he could perform the "Material Duties" of a truck driver, which was the relevant inquiry.

areas"). The latter constituted one of Whetstone's "Essential Functions" at F&S; the former quite clearly did not. (*See* R. at 331, 581-84.) Nevertheless, United partially relied on this finding to conclude that Whetstone still appeared able to perform his "Material Duties." (R. at 299, 536.) This was improper. *See Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507 (6th Cir. 2005) ("[T]he fact that Kalish might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day.")

Other pillars of United's decision likewise offered little insight into Whetstone's ability to drive commercially—namely, Dr. Yuppa and Dr. Service's observations regarding Whetstone's apparent lack of various psychosocial symptoms (*e.g.*, suicidal or homicidal ideation, delusions and disorganized thoughts, or "excessively withdrawn behavior"). These findings are irrelevant. For one, the suggestion that Whetstone needed to suffer "severe psychiatric symptoms" to be "Disabled" is "inconsistent with the terms of the [LTD Policy]," which focused on whether claimants could perform the "Material Duties" of their occupation. *See Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 607-08 (6th Cir. 2014). Moreover, Whetstone *did* report or exhibit severe psychosocial symptoms. As United's own clinical nurse observed in the same month Whetstone applied for LTD benefits, Whetstone's medical records showed that he continually experienced "episodic mood lability, significant anxiety, psychomotor agitation, anhedonia, and isolation to his home." (R. at 303); (*see also* R. at 335, 337, 557-68.) Likewise, the notes of Dr. Tripp reflect that (1) Whetstone "sometimes" experienced "derealization," and (2) Whetstone exhibited a "poor" or "reduced" ability to concentrate. (R. at 766-67, 769-70, 772-73.) These may not have covered the gambit of symptoms that Dr. Yuppa

and Dr. Service associated with "functional impairment," but, again, the absence of those symptoms had little bearing on whether Whetstone was "Disabled" under the LTD Policy.

Of course, United's decision was not animated by these findings alone. It relied most heavily on Dr. Yuppa and Dr. Service's conclusion that Whetstone failed to provide "objective" evidence of general cognitive impairment. (R. at 299, 536.) Aside from the fact that the LTD Policy did not explicitly obligate Whetstone to provide such evidence—which is problematic in its own right—as well as the fact that neither "peer reviewer" elaborated how, specifically, Whetstone's driving ability should have been examined, this shared finding, on its own, says little about Whetstone's disability (or lack thereof). The "absence of evidence is not evidence of absence of an impairment." *Tiedel v. Reliance Standard Life Ins. Co.*, No. 1:16-cv-1089, 2020 WL 1872348, at *7 (W.D. Mich. Apr. 15, 2020); *see also Javery v. Lucent Techs., Inc. Long Term Disabiltiy Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 702 (6th Cir. 2014) ("In particular, we are troubled by the fact that Dr. Goldman overlooked certain evidence in the file and drew adverse conclusions about the 'absence' of such evidence"). And, here, the "absence" of unspecified cognitive testing says little about whether Whetstone was predisposed to suffering debilitating panic attacks while driving a tractor trailer.

### 3. United's Other Evidence (Not Including Its "Peer Reviews") Was Weak

United asserts that, in addition to the Yuppa and Service Reports, it "reviewed the findings of the Pennsylvania Bureau of Workers' Compensation" in rendering its benefits decision. (Def.'s Resp., ECF No. 19 at PageID #1115.) Yet the "findings" it relied upon offered no rationale whatsoever for the Bureau's decision, or that Whetstone later received a settlement for his workers' compensation claim. (R. at 43, 218.) More importantly, the Bureau's analysis looked only at

whether Whetstone's injury from the MVA was "work-related." [7]  But the LTD Policy did not require a claimant's "Injury or Sickness" to stem from a "work-related" event, rendering the Bureau's decision irrelevant to the issue of whether Whetstone was "Disabled."

Accordingly, this evidence—even in tandem with the Yuppa and Service Reports—provides little basis for United's ultimate conclusion.

### B.  United's Review Was Also Procedurally "Irrational"

Whetstone argues that United's substantive errors were enabled by a review process that failed to afford him a "full and fair review" of his claim (*i.e.*, that its review process was "irrational"). 29 C.F.R. § 2560.503-1(h)(1). Specifically, he asserts that United (1) failed to consider the "dangers" of driving a truck (2) improperly relied on the opinions of its "peer reviewers" when it could have had him medically examined; (3) improperly discounted—and, in some respect, entirely ignored—reliable medical evidence that supported Whetstone's claim; and (4) "succumbed to its dual-role conflict of interest."  (Pl.'s Mot., ECF No. 14.)

The Court, for reasons it has and has not yet touched upon, agrees with most of these arguments.

### 1.  United Ignored Evidence Related to Whetstone's Occupational Duties

Whetstone asserts that, in reviewing his claim, United failed to consider "the extreme danger of driving a tractor-trailer truck, the most essential material duty of [his] job." (Pl.'s Mot., ECF No. 14 at PageID #1095.)  United does not claim otherwise. It contends, rather, that its benefits decision "was supported by the evidence i[n] the record"—specifically, by the opinions of Dr. Yuppa and Dr. Service—and suggests that Whetstone's position on the specific dangers of

---

[7] As Whetstone observes, United did not acknowledge any difference in the "definitional standard for disability" between a worker's compensation claim and a claim under the LTD Policy.  (Pl.'s Resp., ECF No. 20 at PageID #1144.)

truck driving should be ignored because, in pointing them out, he relies on evidence that is not part of the record. (Def.'s Resp., ECF No. 19 at PageID #1124.)

The Court, as discussed above, disagrees with the first prong of United's response. The second prong does little to neutralize Whetstone's point. The record reflects that Whetstone gave United ample reason to consider (1) the particular "stresses of commercial motor vehicle driving" and (2) the inherent danger of trying to commercially drive *with a driving-induced anxiety disorder*. On appeal, Whetstone specifically asked United to consider a federal safety regulation which noted that commercial drivers "must have the perceptual skills to monitor a sometime complex driving situation, the judgment skills to make quick decisions, when necessary, and the manipulative skills to control an oversize[d] steering wheel, shift gears using a manual transmission, and maneuver a vehicle in crowded areas." (R. at 581.) That same regulation also notes that:

> [m]any bus and truck drivers have documented that 'nervous trouble' related to neurotic, personality, or emotional or adjustment problems is responsible for a significant fraction of their preventable accidents. The degree to which an individual is able to appreciate, evaluate and adequately respond to the environmental strain and emotional stress is critical when assessing an individual's mental alertness and flexibility to cope with the stresses of commercial motor vehicle driving.

(R. at 584.)

United, as Whetstone argues, did not just fail to weigh the evidence of his PTSD diagnosis in relation to the relevant skills of his occupation—it ignored those skills (and the mental abilities required to exercise them) entirely. This oversight "weighs toward the Court's conclusion" that its review process was not rational. *See Haning*, 140 F. Supp. 3d at 673 (quoting *Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan*, 936 F. Supp. 2d 868, 891 (S.D. Ohio 2013)).

### 2. United Relied on Independent "File Reviews" Despite Its Ability to Have Whetstone Medically Examined

The Sixth Circuit has repeatedly held that "file reviews are questionable as a basis for identifying whether an individual is disabled by mental illness." *Javery*, 741 F.3d at 702; *Smith*, 275 Fed. Appx. at 508; *James*, 582 Fed. Appx. at 589. This is especially so when the plan administrator, in relying on said reviews, chooses to make "adverse" credibility findings related to the claimant without having him or her medically examined. *See Shaw*, 795 F.3d at 550 (plan administrator inappropriately "discounted" the findings of the claimant's diagnosing physician—which the administrator believed were "based solely on [the claimant's] own subjective complaints of pain"—after choosing not to have the claimant medically examined); *Javery*, 741 F.3d at 702 ("[R]eliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints.") (citation omitted); *Smith*, 275 Fed. Appx. at 508 (noting that "the failure of the administrator" to have the claimant examined, "especially when faced with a claim of mental and emotional instability," evidenced that its denial of benefits decision was arbitrary and capricious).

United asserts that it did not "question [Whetstone's] credibility," but the record says otherwise. Whetstone's medical documentation shows that he consistently reported suffering driving-induced panic attacks that forced him off the road. United's "peer reviewers," despite never examining Whetstone (or even discussing his treatment with the mental-health care provider he consulted with the most, Therapist Feragotti), and despite the inherently subjective nature of his symptoms, found that those medical records were not "compelling" evidence of "functional impairment" *because* they appeared to be "solely based" on Whetstone's self-reports. (R. at 519, 825-26.) That is the essence of a credibility assessment, and it is one that United had no clear basis to adopt. *See Javery*, 741 F.3d 702. This further casts its review process in an unfavorable,

arbitrary-and-capricious light. *See Hayden*, 763 at 607 ("When a reviewing physician's report is "inadequate," a plan administrator cannot be said to engage in a deliberate, principled reasoning process when it adopts the position of that report."); *see also Shaw*, 795 F.3d at 550; *Smith*, 275 Fed. Appx. at 508; *Elliott*, 473 F.3d at 620; *Haning*, 140 F. Supp. 3d at 666.

### 3. United Improperly Disregarded "Objective" Medical Evidence of Whetstone's Disability

As discussed, United chose not to credit the diagnoses of Whetstone's treating practitioners because "[t]here were no objective measures used to assess [Whetstone's] cognition and there were no subjective descriptions of any observed cognitive problems."  (R. at 299, 304.)  To underscore those points, United noted that "[t]here was no evidence that [Whetstone] was hospitalized" or "seen in the emergency room" for his stated condition.  (R. at 299.)  Whetstone asserts that this is untrue. He contends that the diagnoses of his treating practitioners *were* supported by "objective evidence," and that United simply overlooked or ignored it to justify its decision. The Court agrees.

"[W]hen the provisions of a plan explicitly require objective evidence and/or preclude the claimant's reliance on other types of evidence, such as [a] physician opinion or self-reported symptoms," a claimant's failure to corroborate the opinions of his or her medical providers with "objective medical evidence" may give an administrator "sufficient reason . . . not to credit [those] opinion[s]." *Zenadocchio*, 936 F. Supp. 2d at 886-87 (quoting *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 Fed. Appx. 978, 987 (6th Cir. 2010)); *Haning*, 140 F. Supp. 3d at 666. However, when a plan does not explicitly demand the claimant to provide objective evidence to prove his or her disability, it "cannot use this demand as grounds to give no probative value to other evidence." *Haning*, 140 F. Supp. 3d at 666 (quoting *Zenadocchio*, 936 F. Supp. 2d at 887).

Here, the LTD Policy made no express demand for "objective" evidence. Nevertheless, United, citing this Court's decision in *Hammonds v. Aetna Life Ins. Co.*, argues that it was not

"irrational or unreasonable" for it to consider the absence of such evidence as grounds to discount Whetstone's medical records as a whole. (Def.'s Mot., ECF No. 13 at PageID #1077) (citing *Hammonds v. Aetna Life Ins. Co.* No. 2:13-cv-310, 2015 WL 1299515, at *16 (S.D. Ohio Mar. 23, 2015)). This argument misses the mark for several reasons. For one, the underlying cause of the *Hammonds* claimant's disability—a "degenerative disc disease"—lent itself much more to objective verification (*e.g.*, via an MRI) than Whetstone's mental condition. 2015 WL 1299515, at *16 (validating a reviewing physician's conclusion that the claimant's MRI "did not provide a basis for the severe physical limitations imposed" by her treating physicians); *cf. James*, 582 Fed. Appx. at 589; *Smith*, 275 Fed. Appx. at 508 (citation omitted). Thus, there, it was reasonable for the administrator to base its decision on the claimant's lack of "objective" proof, given its basic availability. Not so here. As discussed, the symptoms underlying Whetstone's disability—namely, his susceptibility to driving-induced panic attacks—were not conducive to objective measurement. And if they were, United (and its "peer reviewers") never explained *how*. Nor did United bother to gather this data itself, even though it had the opportunity to do so.

Those, however, are only ancillary points. The main reason why United had no reasonable basis to discount Whetstone's medical records is that they did, in fact, contain "reliable" and "objective" information supporting his claim. This included (1) records from his midnight hospitalization for chest pain, which his attending physicians concluded was "likely" anxiety-induced, and which contained two "abnormal" EKGs; (2) the external, in-person observations of Whetstone's treating practitioners (*e.g.*, Dr. Tripp's consistent view that Whetstone exhibited a "poor" or "reduced" ability to concentrate), and (3) a timeline of Whetstone's prescriptions, which reflected his mounting anxiety symptoms. This evidence not only runs counter to United's narrative that Whetstone presented no "reliable" proof of his disability—it flat-out contradicts its

belief that he offered "no evidence" of hospitalization or "subjective descriptions of any observed cognitive problems." (R. at 299, 304.) Such indicates one of two things: that United (1) unintentionally overlooked the objective medical evidence that Whetstone provided, or (2) cast it aside it because it did not fit an "overly crabbed" definition of objectivity. *Haning*, 140 F. Supp. 3d at 666. Either route demonstrates that United conducted a "selective review" of the record, which lends further credence to the notion that its decision was arbitrary and capricious. *Moon*, 504 F.3d at 381; *accord Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) (plan administrator arbitrarily and capriciously accepted file reviewer's disregard of subjective symptoms based on incorrect belief that claimant's file lacked "objective data"); *Miller v. Aetna Life Ins. Co.*, No. 2:19-cv-500, 2020 WL 2112163, at *9 (S.D. Ohio 2020) (finding that the administrator's "cherry-picking" of the administrative record evinced its irrational decision-making process).

### 4. United Possessed a Conflict of Interest

"The Supreme Court has recognized that an inherent conflict of interest exists when a defendant plays the 'dual role' of both deciding a plan participant's eligibility for benefits and paying out those benefits from its own coffers." *Autran*, slip op. at 9 (citing *Glenn*, 554 U.S. at 108). Here, both parties agree that was the case with United. They disagree, however, as to how much (if at all) that fact should bear on the rationality of United's decision to deny Whetstone benefits.

United, for its part, notes that just because it was structurally conflicted does not mean that its decision was *influenced* by said conflict, and asserts that Whetstone has failed to present evidence demonstrating as much. (Def.'s Resp., ECF No. 19 at PageID #1124.) Whetstone begs to differ. He contends that United's (1) refusal to "credit his statements and reliable medical

evidence[;]" (2) failure to medically examine him; (3) failure to consider the "dangers of his job" or the federal trucking regulation he submitted; and (4) reliance "on flawed peer review reports to justify its denial of benefits" all show that United's conflict of interest infected its review process. (Pl.'s Mot., ECF No. 14 at PageID #1105) (citing *Haning*, 140 F. Supp. 3d at 675). The Court, to some extent, agrees.

It is well-settled that an administrator's conflict of interest "must be a 'factor' to consider when deciding whether [it] arbitrarily denied benefits." *Autran*, slip op. at 9 (citing *Glenn*, 554 U.S. at 108). In evaluating this type of conflict, courts are not "to create special burden-of-proof rules, or other special procedural or evidentiary rules." *Glenn*, 554 U.S. at 116. They are merely to account for it, on a case-specific basis, as one of "several different considerations" in evaluating the "lawfulness" of a benefits denial. *Id.* at 117. Of course, there are circumstances where this factor can be "more important" (such as when the administrator "has a history of biased claims administration") or "less important" (such as when the administrator has "walled" off claim decision-makers "from those interested in firm finances"). *Id.* In that vein, the Sixth Circuit has afforded an administrator's conflict of interest greater weight when there is evidence that it "materialized in a concrete way to influence the administrator's decisional process," such as "internal emails suggesting bias against granting a claim or repeated reliance on a suspect doctor with a history of questionable medical opinions." *Autran*, slip op. at 9 (citations omitted).

As United notes, Whetstone has not offered any "concrete" (*i.e.*, direct) evidence that its structural conflict influenced its decision to deny Whetstone benefits. But that position only goes so far. United's structural conflict itself—as well as any circumstantial evidence suggesting that its decision was influenced by its "dual role"—still factors into the equation. *See Haning*, 140 F. Supp. 3d at 675 (finding that the administrator's "conduct in administering [the claimant's] claim,

30

'which consisted of selective deference to opinions and medical evidence regarding [her] eligibility, render[ed] the conflict of interest significant'") (quoting *Zenadocchio*, 936 F. Supp. 2d at 886). And, here, United's conduct—namely, its selective review of the record and deference to the opinions of non-examining physicians who did not actually consider the mental requirements of Whetstone's occupation—is at least somewhat probative of Whetstone's allegation that it was predisposed to denying his LTD claim. *Id.*; *see also Holler v. Hartford Life & Acc. Ins. Co.*, 737 F. Supp. 2d 883, 892 (S.D. Ohio 2010) ("Defendant's emphasis on its own doctor's record review and its de-emphasis of the opinions of Plaintiff's treating physicians is a 'serious concern' that 'taken together with some degree of conflicting interests' can properly be the basis for setting aside an insurer's discretionary decision.") (quoting *Glenn*, 554 U.S. at 118). United does not point to any evidence to the contrary. *See Glenn*, 554 U.S. at 117. Accordingly, this factor, to some extent, casts its review process in an even more dubious light.

### C. Conclusion

All told, United's "unsupported (and at times internally inconsistent) rejection of the opinions of [Whetstone's] treating medical providers, coupled with its questionable reliance on file reviews that were, under the circumstances, insufficient" to justify its final conclusion, rendered its denial of Whetstone's LTD benefits claim arbitrary and capricious. *Haning*, 140 F. Supp. 3d at 675 (citing *Smith*, 275 Fed. Appx. at 509). This holding is not the result of any "single factor." *Id.* Rather, it is the "cumulative" product of the Court's foregoing findings—all of which demonstrate, on a collective scale, that United's decision to deny Whetstone LTD benefits was both substantively and procedurally irrational. *Id.*

## IV.    REMEDY

The Court, having determined that United's denial of benefits was arbitrary and capricious, now turns to the proper remedy. This requires it to answer two threshold questions: (1) whether the LTD Policy's "Mental Disorder Limitation" applies, and (2) whether Whetstone has sufficiently proven that he is entitled to LTD Benefits. It answers both questions in the affirmative.

### A. The "Mental Disorder Limitation" Applies

United argues in the alternative that, if Whetstone is entitled to benefits under the LTD Policy, his benefits award should be capped to twenty-four months pursuant to the policy's "Mental Disorder Limitation." (Def.'s Mot., ECF No. 13 at PageID #1082.)  Whetstone disputes this.  (Pl.'s Resp., ECF No. 20 at PageID #1142.)  He contends that, because the genesis of his disability (PTSD) manifests "neurobiological changes" (*i.e.*, "low cortisol"), as well as other physical symptoms such as "headaches, sleep disturbance, nightmares, and flashbacks," he is physically disabled—and, therefore, that the Mental Disorder Limitation need not apply.  (*Id.* at PageID #1142-43.)  In support, he points to one out-of-circuit case which reiterates that the symptomology of PTSD can satisfy the "physical consequences" requirement of a negligent infliction of emotional distress claim. *See Sawyer Bros., Inc. v. Island Transp.,* 887 F.3d 23, 40-41 (1st Cir. 2018).

The rules of tort law, however, do not apply here; the LTD Policy's terms do. *See, e.g.,* *Javery*, 741 F.3d at 701 ("To succeed in his claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that he was 'disabled,' as that term is defined in the Plan.") And, here, that policy generally capped a claimant's recovery period for any "Disability [that] is a result of a Mental Disorder" to twenty-four months. (R. at 272.)  It also, as noted, defined the term "Mental Disorder" to include "any condition or disease, regardless of cause, listed in the

most recent edition of the International Classification of Diseases (ICD) and the Diagnostic and Statistical Manual of Mental Disorders (DSM) as a mental disorder." (R. at 282.) Post-traumatic and "acute stress" disorders fall within the ambit of that definition during the relevant time-period. (*See*, *e.g.*, R. at 210, 333, 339) (referencing the ICD codes and DSM axes of acute stress reactions and PTSD).

The gravamen of Whetstone's disability stemmed from his susceptibility to driving-induced panic attacks (or other "fear responses") that could spontaneously force him off the road. The symptoms associated with these episodes may be physical in nature, but they still "resulted" from PTSD/acute stress—that is, from a "Mental Disorder." There is no way to interpret Whetstone's disability claim otherwise. Accordingly, the Court finds that the LTD Policy's "Mental Disorder Limitation" applies.

**B. Whetstone Is Entitled to LTD Benefits**

Once a court determines that a plan administrator acted arbitrarily and capriciously, it "may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621. "A remand to the plan administrator is appropriate 'where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled.'" *Haning*, 140 F. Supp. 3d at 675 (quoting *Elliott*, 473 F.3d at 622). Remand, however, is discouraged to the extent it gives a plan administrator "two bites at the proverbial apple where the claimant is clearly entitled to disability benefits." *Cooper*, 486 F.3d at 172. It is incumbent on plan administrators to "properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Id.* In that vein, claimants have been awarded benefits when "objective medical evidence clearly established the claimant's disability, even in

circumstances where the plan administrator's decision-making process 'was unquestionably flawed.'" *Calhoun v. Life Ins. Co. of N. Am.*, 665 Fed. Appx. 485, 497 (6th Cir. 2016) (quoting *Shaw*, 795 F.3d at 551).

Here, objective medical evidence supported Whetstone's disability claim. As discussed, Whetstone's medical records (including his "abnormal" EKGs and the observations of his treating practitioners), hospitalization, and persistent reliance on a mix of anti-anxiety medications and weekly psychotherapy all lend credence to the notion that he suffered from PTSD during the relevant time period. *See Hayden*, 763 F.3d at 609 (awarding the plaintiff long-term disability benefits arising from a mental disability claim because "[s]he supported her claim with the opinions of" her three mental-health care providers, "each of whom separately agreed that she suffered from anxiety and depression and was significantly impaired in her ability to perform the functions of her, or any, occupation"). The record also shows that, throughout this period, Whetstone (1) repeatedly suffered driving-induced panic attacks and (2) demonstrated an increasing aversion to regular driving, going so far as to try to arrange third-party transportation to his medical appointments.

While United never fully defined Whetstone's "Material Duties" (or "Regular Occupation"),[8] it stands to reason that part of those duties included having the capacity to safely maneuver a tractor trailer in high-stress situations. (*See* R. at 581, 584.) Whetstone's condition, as described, logically precluded that ability. (*See* Pl.'s Mot., ECF No. 14 at PageID #1096) ("Due to his illness, in heavy traffic, Mr. Whetstone would likely need to pull of the road unexpectedly

---

[8] United's only attempt to define Whetstone's occupation came in its Affirmation Letter, which noted that his position, according to the DOL, "occasionally" required him to exert "20 pounds to 50 pounds of force." (R. at 297.) This reference—notwithstanding the fact that it had little to do with Whetstone's driving responsibilities—is relevant to the extent that it shows that United turned to the DOL to decipher Whetstone's "Material Duties." The Court, confined to the record, does the same. (See R. at 581-84.)

to allow his PTSD or panic symptoms to subside. Trying to do this suddenly would be dangerous.").

Thus, in light of the foregoing, as well as the fact that United has not argued for remand, the Court finds that Whetstone was "Disabled" under the LTD Policy—and, accordingly, is entitled to LTD benefits. *See Haning*, 140 F. Supp. 3d at 676 (determining that the plan administrator's failure to argue for remand "forfeit[ed] the issue") (citing, inter alia, *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 372 n.7 (6th Cir. 2009)).

## V.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Whetstone's Motion for Judgment on the Administrative Record (ECF No. 14) and **DENIES** United's Motion for Judgment on the Administrative Record (ECF No. 13). Pursuant to the terms of the LTD Policy, Whetstone is entitled to benefits from the date his STD benefits expired (November 7, 2018) up to a maximum period of twenty-four months.

This case is to be closed on the docket of this Court.

**IT IS SO ORDERED.**


**3/28/2022**                                          **s/Edmund A. Sargus, Jr.**
**DATE**                                                  **EDMUND A. SARGUS, JR.**
                                                               **UNITED STATES DISTRICT JUDGE**